IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RONALD ANDERSON,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>Defendant. | **MEMORANDUM DECISION & ORDER**<br><br>Case No:  2:09-CV-294 DN<br><br>Magistrate Judge David Nuffer |

Plaintiff Ronald Anderson filed suit seeking judicial review of the decision of the Commissioner denying his applications for Disability Insurance Benefits and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act.[1]  Plaintiff alleged that he was unable to work due to fainting spells, agoraphobia with panic attacks, depression, and borderline intellectual functioning.  The case is before the magistrate judge by consent of the parties under 28 U.S.C. § 636(c).[2]  After a careful review of the entire record and the parties' submissions, the magistrate judge concludes that the decision of the Commissioner should be affirmed.

---

[1]42 U.S.C. §§ 401-434, 1381-1383f.

[2]Docket no. 18, filed August 31, 2009.

## PROCEDURAL HISTORY

Anderson applied for benefits in September 2005 ,[3] alleging that he became unable to

work on October 2, 2002.[4]  Anderson's applications were denied initially,[5] and on

reconsideration.[6]  Anderson then obtained a hearing before an Administrative Law Judge (ALJ)

which was held March 12, 2008.[7]  In a written decision, the ALJ determined that Anderson was

not eligible for benefits because he was capable of performing jobs that exist in significant

numbers in the national economy.[8]  The Appeals Council denied Anderson's request for review,

making the ALJ's decision the final decision of the Commissioner.[9]

## SUMMARY OF EVIDENCE

### A. Evidence at the Administrative Hearing

#### 1. Anderson's Testimony

At the time of the ALJ's decision, Anderson was 29 years old.[10]  Anderson testified that

he had difficulties in school with anger and uncontrolled behavior which resulted in

suspensions.[11]  He did not do very well academically, was in resource classes, and dropped out in

---

[3]Tr.70-74; 325-31; see tr. 17.

[4]Tr. 70, 325.  Anderson subsequently amended the alleged onset date to March 1, 2004.  (Tr. 17, 343.)

[5]Tr. 58, 60-62.

[6]Tr. 59, 64-66.

[7]A transcript of the hearing may be found in the administrative record at pages 341-408.

[8]Tr. 42.

[9]Tr. 5-8.

[10]Tr. 348.

[11]Tr. 348-49.

the tenth grade.[12]  He has problems with reading and writing, and cannot read a newspaper or write a letter.[13]  Regarding arithmetic, he can do a little adding and subtracting, but no multiplying or dividing.[14]

Anderson's past jobs included cleaning ditches for the city, working in shipping at an archery place, and loading trucks for Albertsons where he drove a forklift.[15]  He worked at the Albertsons job about four years[16]  Anderson had trouble with forgetting things; and eventually was let go.[17]

Anderson testified that toward the end of his employment with Albertsons, he suffered from anxiety attacks where he would go and hide in the warehouse.  During these attacks, he would feel anxious, embarrassed, and scared.  He would have to hide for about an hour before he could go back to work.[18]  Anderson did not regularly work with others or with supervisors, so that his employer was not aware of the anxiety attacks or the hiding.  Anderson stated that he would have these attacks every day.[19]  Anderson also stated that he would "pass out in the trailers."  During these episodes which would happen at least once every day, he would lose

---

[12]Tr. 349.

[13]Tr. 349-50.

[14]Tr. 350.

[15]Tr. 350-51.

[16]Tr. 351.

[17]Tr. 352.

[18]Tr. 352-53.

[19]Tr. 353.

consciousness and fall to the ground.[20]  When asked if anyone had ever seen him pass out at work, Anderson stated that one of his friends had.  The friend asked him if he was okay, and Anderson said yes and got back up.  Anderson could not remember if he ever got hurt from falling down after passing out at work.[21]

Anderson did not get treatment for the anxiety or passing out while he was working. After he lost his job, he sought treatment, and was placed on "a bunch" of medications, but they did not help.  Anderson testified that his condition was about the same at the time of the hearing as when he last worked five years earlier.[22]

In 2004, Anderson tried to go back to work.[23]  When he was called for a job interview, he would leave the house, but he would not actually go to the interview because he felt stupid, anxious, and scared.[24]  At about the same time, Anderson tried to take a class in auto mechanics. He stated that this did not go well, because after he went to some classes, he realized that he could not actually do the work.  He was not able to read or write well enough or understand the material.  He also had a problem even going to class.  He would pull into the parking lot and sit there, but would be too scared to go in, and eventually he dropped out.  Anderson estimated that he went to class about four or five times, and sat out in the car about thirty times.[25]

---

[20]Tr. 353-54.

[21]Tr. 354.

[22]Tr. 355.

[23]Tr. 355.

[24]Tr. 356-57.

[25]Tr. 357-59.

Concerning his daily activities, Anderson takes care of his fourteen-month-old son for four-to-six hours while his wife works.  During this time, he mostly sits on the couch and watches TV.[26]  His daughters do the housework.  He does not prepare meals, wash dishes, or do any housework because he is afraid of having a fainting spell and falling.[27]  Anderson testified that he has fallen and hurt himself in the past.  He stated that he faints at least once a day, but he does not know how long he is out during these episodes.[28]  Although Anderson drives a little, his doctor has said that he should not drive until he goes at least six months without a fainting spell.[29]  Anderson stated that he had never gone even a week without a fainting spell.[30]

Anderson does not do the grocery shopping or engage in any social visits because he does not like being around people.  He stated that "it's scary," and he feels like they are staring at him.[31]

Anderson is able to bathe and dress himself.  He does not take a shower, but sits in the bathtub for fear of falling.[32]

---

[26]Tr. 359-60.

[27]Tr. 361.

[28]Tr. 362.

[29]Tr. 362-63.

[30]Tr. 363.

[31]Tr. 362.

[32]Tr. 363.

Anderson's attorney questioned him about his ability to focus.  Anderson stated that his wife gives him tasks to do around the house.  He sometimes starts them, but he never finishes them because he just forgets all about them.[33]

Anderson stated that he has trouble getting along with people.  He is suspicious of people and thinks that everybody is staring at him.[34]  He sometimes goes to the store with his wife, but he thinks people are staring at him, so he goes and hides in the truck.[35]  He went to a wedding reception with his wife, but he could not stay.  He felt uncomfortable like everybody was looking at him, so he went and sat in the truck.[36]

When Anderson was working, he sometimes became angry with his supervisors when they criticized his work.  Rather than show his anger, he would take it out on the trailer by slugging the walls.[37]  Similarly, when his wife criticizes him, he gets "really mad," and yells at her a lot.[38]

The ALJ asked Anderson whether he would try a job where he would just sit in a cabin in a canyon and watch over things for the owner.  Anderson responded that it would be kind of scary–being out in the woods.[39]  The ALJ then asked what else would be scary about it, and

---

[33]Tr. 364.

[34]Tr. 364.

[35]Tr. 364-65.

[36]Tr. 365.

[37]Tr. 365-66.

[38]Tr. 366.

[39]Tr. 366.

Anderson replied, "I'd be afraid I'd kill myself."[40]  After surmising that Anderson was afraid of being alone, the ALJ asked if he would go back to the warehouse job at Albertsons if it was offered.  Anderson said probably not.[41]

The ALJ asked when was the last time Anderson had left home by himself, and Anderson replied that he could not remember because it had been too long.[42]  Anderson also could not remember the last time he drove a car.[43]

Anderson stated that the last time he had left his house prior to the hearing was about a week before when he went with his wife to his mother's house for a family gathering.  Anderson stated that it was very frustrating because there was too much noise.  They left after about a half hour.[44]

A few days before the hearing, Anderson had spent about four or five hours home alone with his young son.  He reported that during that time, his anxiety and depression level (mental symptoms) were at seven on a scale of one-to-ten.[45]  During the hearing, he rated his symptoms at a nine.[46]

---

[40]Tr. 367.

[41]Tr. 367.

[42]Tr. 367.

[43]Tr. 367-68.

[44]Tr. 369.

[45]Tr. 370.

[46]Tr. 371.

Anderson stated that the last time he had fainted was the day before the hearing, but he could not remember what time of day it was or how long he was out.  He did not think he hurt himself.  He stated that the fainting spells come out of the blue, but they might be increased by anxiety.[47]  He had been particularly anxious that day because he was really nervous about going to the hearing.[48]  Anderson had not yet fainted on the day of the hearing.[49]

The ALJ asked if Anderson's only physical problem was the fainting spells.  Anderson responded that he also has headaches, which sometimes prevent him from taking care of his son. The last time he had a bad headache was about three days earlier which lasted until he went to bed.  He takes Depakote to prevent the headaches, but does not take any pain medication.[50]

Anderson had a fishing license at the time of the hearing, but stated that he had not been fishing in about three years since his dad died.  In response to questioning by the ALJ, he stated that he would not be able to spend the whole day out fishing with his wife because he gets too anxious and too tired of sitting around.  This would be true even if the fishing was good.[51] Anderson stated that he was most comfortable at home.[52]

---

[47]Tr. 371.

[48]Tr. 372.

[49]Tr. 372.

[50]Tr. 372-73.

[51]Tr. 374-75.

[52]Tr. 375.

The ALJ asked Anderson why he had been written up on his previous job.  Anderson stated that he had been written up for not following directions, and not doing as much as he was supposed to do.[53]

Anderson could remember only one time when someone saw him pass out at work.[54]  He sometimes would pass out in the back where he was hiding.  It was hard to remember when he passed out unless he injured himself.  He pretty much lost track of time.[55]

On questioning by his attorney, Anderson stated that he tried to work at a job delivering auto parts in September 2005.  It did not work out because he got dizzy when he started driving.  And when he got to his destination, he was too scared to take the parts in.  He lasted only one full day on the job.  He did not actually deliver any parts because he had someone else with him who took the parts in.[56]  Anderson was supposed to take the parts in, but he was too scared and nervous, and could not do the paperwork that he was required to fill out.[57]

**2. Testimony of Amy Anderson**

Plaintiff's wife, Amy Anderson, testified that Anderson was still working at the warehouse when she married him.  She was not aware of the problems he was having at work until after he lost his job.  Then one of his friends told her he had found Anderson passed out in a truck a couple of times–he'd had a seizure at work.  She did recall one time while Anderson was

---

[53]Tr. 378.

[54]Tr. 378.

[55]Tr. 379.

[56]Tr. 380.

[57]Tr. 380-81.

working, when she was called to the emergency room because he had passed out, turned blue, and could not breathe.  But they thought it was caused by his medication.[58]  At home, while he was still working, he would get nervous, stress out about work, and tell her that he did not understand some things, but nothing really major.[59]  He had started fainting at home a little, but not too much.  His mother told them that it had happened when he was a kid.  Amy estimated that while he was still working, he would faint at home once or twice a week.[60]  Amy testified that he also was very depressed, and talked about suicide a lot.[61]

They have never been very social, and stay at home most of the time.  If they do go anywhere, it is to his mom's house where they stay a few minutes and come home.[62]  Last year, they went out to a movie for Anderson's birthday, but that was the only time they had gone out in the past four or five years.[63]

Amy testified that after Anderson lost his job, he was a lot more upset and nervous, paced a lot, and would sleep all the time.  They took him to the doctor, who said he was depressed.  Amy could not remember if Anderson received treatment or medication for his problems while

---

[58]Tr. 383.

[59]Tr. 383.

[60]Tr. 384.

[61]Tr. 384.

[62]Tr. 384.

[63]Tr. 385.

he was still working.  After he lost his job, he began taking medication for depression and high blood pressure.[64]

Amy testified that Anderson has trouble with reading, writing, and arithmetic.  She stated that he is dyslexic; he sees things backwards, and writes them backwards.  She reads things to him because he does not understand them if he does read them.[65]

Regarding Anderson's attempt to work at the delivery job, Amy stated that he told her that he was fired because he was too embarrassed to admit that he had quit.[66]  She also recalled his stating that he was going to job interviews, but found out later that he did not actually go to the interviews because he was too nervous.[67]  She also testified about Anderson's attempt to go to school.  She stated that he loves mechanics, but there were a lot of things they were having him do that he did not understand.  He had to read textbooks, do a lot of writing, and take tests, and he did not understand how to do it.  He ended up missing some classes, and then just quit because he did not understand any of it.  She believed that Anderson sat in the car and did not go into class more than half the time, about three times a week.[68]

---

[64]Tr. 385.

[65]Tr. 385-86.

[66]Tr. 386.

[67]Tr. 386-87.

[68]Tr. 387.

She stated that Anderson talks about suicide at least once a week, and has actually attempted suicide five or six times in the last eight years.  She stated that he locks himself in the bedroom, cuts his wrists with a knife, and passes out. [69]

Regarding Anderson's passing out, Amy stated that he passes out probably every ten minutes on a bad day.[70]  When asked what makes a bad day, she stated that it is when he is under a lot of stress or when is medicine is not working right.[71]  On better days, he passes out about once a day, or maybe four times a week.  Amy stated that her daughter calls her at work and tells her that Daddy has fallen down again.  Amy has left work on more than one occasion because of this.  When asked if Anderson has ever had a seizure from passing out and falling down, Amy stated that he has had seizures a few times, but she is not sure what causes them.  He has had injuries from passing out and falling.  For example, he has scraped his back, hurt his elbow, popped his shoulder out of the socket numerous times, bumped his head, and hurt his knee.  One time, he fell down the stairs and had a seizure at the bottom.  He went to the hospital that time.[72]

Amy stated that she gives him jobs to do around the house such as fixing the sink, vacuuming the floor, or unclogging the toilet.[73]  He will start on a job and get distracted.  When she asks him if he is going to finish it, he will ask what he was supposed to be doing.  He

---

[69]Tr. 387-88.

[70]Tr. 388.

[71]Tr. 388-89.

[72]Tr. 389.

[73]Tr. 389-90.

completely forgets about it and starts on something else.[74]  When asked about his ability to concentrate and focus on a task, Amy stated that he can concentrate for a couple of minutes, and then his mind will wander and he'll start to do something else.[75]

Amy stated that Anderson has a problem getting along with other people, and prefers to be by himself.  He doesn't like to go anywhere with her and will stay home or sit in the car.  He thinks people are staring at him.[76]  He does not like to be around people at all, and gets very nervous around them.  He gets angry at people for voicing their opinions.  When someone corrects him or criticizes him, he gets mad or yells or just walks away and locks himself in his bedroom.[77]

During the day, Anderson takes care of the baby and watches the other children after they come home from school.  Taking care of the baby includes changing diapers, feeding him, giving him his nap, and watching out for his safety.[78]  Anderson does not do any meal preparation.[79] Amy does the dishwashing, laundry, grocery shopping, and housecleaning although Anderson occasionally might sweep the floors.[80]

---

[74]Tr. 390.

[75]Tr. 390.

[76]Tr. 390.

[77]Tr. 390-91.

[78]Tr. 391.

[79]Tr. 391-92.

[80]Tr. 392.

Anderson does not drive because of the seizures, although he had driven a car about a week earlier when he picked the kids up from school during a bad storm.[81]  Amy stated that the seizures were something more than just passing out.  When he has a seizure, he will "pass out and shake."[82]  She stated that Anderson last had a seizure about a month before the hearing.  These episodes, where he shakes in addition to passing out, occur about once every couple of months.[83]  The last time Amy saw Anderson pass out was a couple of days before the hearing, about 5:30 in the afternoon.[84]  She stated that Anderson was in the living room.  He said he wasn't feeling well, and went to sit on the couch.  But he missed the couch and hit the floor.  He was out maybe a minute at the most.[85]

The ALJ asked if the doctors had instructed them to take him to the emergency room if he was unconscious for a certain period of time.  Amy thought the doctors had said that if he is out for two or three minutes, they should take him to the emergency room.[86]  She stated, however, that she did not think that he had ever been out that long.  She did recall one time, a couple of years ago, when the kids could not wake him up, and she asked the neighbors to call an

---

[81]Tr. 392-93.

[82]Tr. 392.

[83]Tr. 393.

[84]Tr. 396.

[85]Tr. 397.

[86]Tr. 397-98.

ambulance.  Amy stated that Anderson does not remember when he passes out, and will ask her what happened.  He is typically out for about a minute.[87]

Anderson spends most of his time watching TV, but does not really focus on it.[88] Regarding caring for himself, Amy stated that she sets out his clothes for him, and he does okay with everything else.[89]

Amy stated that Anderson has headaches in which he complains of stabbing pain or like someone has hit him in the head.  She gives him medication, and he will lie down for a few hours.  The headaches also cause nausea and light sensitivity, and sometimes last for four or five days.  He has the headaches about once a week, sometimes two or three times a week.[90]

The last time Anderson left home by himself was when he went to pick up the children from school.[91]  Amy could not recall the last time they were gone from the house for a whole day.  The last time they went out as a family was to a wedding reception.  Anderson was in the reception for about fifteen minutes before he went out and sat in the car.[92]

When asked which of Anderson's symptoms were the worst in terms of his ability to work, Amy stated the problem with people, the passing out, not being able to drive, and his

---

[87]Tr. 398.

[88]Tr. 393.

[89]Tr. 394.

[90]Tr. 394-95.

[91]Tr. 398.

[92]Tr. 399.

depression.  If she had to pick one, she guessed it would be passing out since it makes him

unable to drive.[93]

### 3. Testimony of the Vocational Expert

The Vocational Expert (VE) testified that Anderson's past relevant work was as a

warehouse laborer which is classified as medium, unskilled work with an SVP rating of two.[94]

The ALJ asked the VE about a hypothetical person who could do a full range of work at

any exertional level, but who had the following limitations:

- could not work around dangerous, unprotected heights, machinery, or chemicals;

- must work at a low stress level which has four elements:  (1) low production level where
  jobs are classified as low, average, and high; (2) essentially no working with the general
  public and just a few people in the work area; (3) only minimal contact with others
  including supervisors and co-workers, but could still respond appropriately to supervision
  and co-workers in work situations; and (4) the ability to deal with only minimal changes
  in a routine work setting;

- must work at a low concentration level, which means the ability to be alert and attentive
  to, and to adequately perform, only unskilled work tasks;

- must work at a low memory level, which means the ability to understand, remember, and
  carry out only simple work instructions (where simple means operating at GED levels of
  reasoning 2-3, math 1-2, language 1-2), essentially no reading, writing, math, or

---

[93]Tr. 401.

[94]Tr. 402.

arithmetic on the job; would have the ability to remember and deal with only minimal changes in work instructions from week to week; and the ability to remember and use appropriate judgment in making only simple work-related decisions.[95]

The VE testified that the hypothetical person would not be able to perform Anderson's past relevant work as he performed it because it would require some math, and reading and writing. However, the job would be available in reduced numbers[96] He stated that there are approximately 160,000 such jobs in the national economy, but they would be reduced by eighty percent due to the very limited reading, math, and language.[97] The VE also identified the jobs of office helper in the clerical industry with 280,000 jobs in the national economy, but those jobs would be reduced by eighty percent.[98] The hypothetical person could also do the job of touch-up screener, which is a sedentary, unskilled job. There are about 80,000 such jobs in the national economy which would be reduced by fifty percent.[99] Finally, he could do the job of kitchen helper which is a medium, unskilled job. There are about 250,000 such jobs in the national economy which would be reduced by eighty percent for the hypothetical.[100]

The ALJ then gave a second hypothetical in which the person would have the following physical problems: significant periods of syncope or passing out, fainting, at times injuring

---

[95]Tr. 402-03.

[96]Tr. 403-04.

[97]Tr. 404.

[98]Tr. 404.

[99]Tr. 405.

[100]Tr. 405.

himself; and significant headaches.  On the mental side, he would have forgetfulness; significant

anxiety and panic such that he would actually leave work, unauthorized, to isolate; significant

levels of fearfulness, anger, and irritability; overall reduced concentration, persistence and pace,

meaning he would be quite slow on the job, running about 15 to 20 percent below average.  He

would miss some work where he would actually go to work, but would not come in.  Instead, he

would isolate because of anxiety and panic, and not actually attend work three to four days a

month.[101]  The VE testified that all of the identified jobs, and all other jobs, would be ruled out.[102]

 The ALJ then asked how much passing out or fainting on the job would be allowed

before the person would lose his job.[103]  The VE responded, "I would think one or two times then

he would be referred for medical care and, you know, depending on the results of that, but

fainting on the job is, you know, it's not disregarded or taken lightly I don't think."[104]

## B. Medical Evidence

### 1. Eric Hogenson, M.D.

 On October 2, 2002, Anderson saw Dr. Eric Hogenson, M.D., complaining of dizziness

for the past week.  Although Anderson had never had high blood pressure before, his blood

pressure was elevated, and he had been experiencing headaches.  While the lab was drawing

blood, Anderson passed out.  He  did not bang his head or fall down, but just slumped down in

his chair.  The doctor noted that the dizziness was "possibly caused by the high blood pressure

---

[101]Tr. 405-06.

[102]Tr. 406.

[103]Tr. 406-07.

[104]Tr. 407.

which is probably secondary because of his age." He was placed on Altace for high blood pressure.[105] The next day, Anderson went to the emergency room complaining of chest pain. He also reported that he had been dizzy, weak, light-headed, had a fast heart rate, and had passed out the day before when his blood was taken. The assessment was (1) near syncope, (2) chest pain, non-cardiac, (3) headache, and (4) hypertension. He was sent home with instructions on fainting, chest pain, and headaches.[106]

When Anderson returned to Dr. Hogenson on October 9, 2002, he had experienced marked improvement in his symptoms with fewer headaches. On October 31, 2002, he had normal, adequately treated hypertension, and felt well without headaches.[107]

On April 30, 2003, Anderson saw Dr. Hogenson about obtaining disability benefits. Dr. Hogenson noted that Anderson had been going to psychotherapy with Richard Peterson. Mr. Peterson felt like Anderson was not yet ready to return to work, but should be ready in the next a month or two. Dr. Hogenson's assessment was major depressive disorder, ADHD, and social anxiety disorder.[108]

On May 12, 2003, Anderson's chief complaint was ADHD and depression. Anderson's counselor had recommended Adderall and Lexapro. Anderson preferred to take one medication to treat both conditions, so Dr. Hogenson prescribed Strattera.[109]

---

[105]Tr. 168.

[106]Tr. 129-30.

[107]Tr. 164.

[108]Tr. 163.

[109]Tr. 163.

On June 3, 2003, Anderson had not experienced any improvement with Strattera, so he was placed on Lexapro and Adderall.  He was given a note stating that he would not be ready to go back to work for thirty days until he was stabilized on his medication.[110]

On July 9, 2003, Anderson reported that the medication was working well.  He was able to study and get through his homework very quickly, but the medication wore off before the day was over.  Dr. Hogenson increased the Adderall to twice a day[111]

On October 21, 2003, Anderson's chief complaint was anxiety.  He was feeling very stressed, complained of panic attacks, and was experiencing suicidal ideation.  Dr. Hogenson stopped the Lexapro and prescribed Effexor and Ativan.[112]

### 2. Mountain View Hospital

On January 27, 2003, Anderson went to the ER with back pain.  During that visit, he denied syncope.[113]

On December 27, 2003, Anderson apparently had passed out, Emergency Medical Services had been called, and they advised him to present to the ER for assessment.  The ER doctor, Karl Vizmeg, M.D., believed that Anderson's symptoms were caused by his having abruptly stopped one of his medications.  He was sent home without further workup.[114]

---

[110]Tr. 162.

[111]Tr. 162.

[112]Tr. 161.

[113]Tr. 212.

[114]Tr. 210.

On July 16, 2004, Anderson went to the ER complaining of chest pain.  The notes indicate that Anderson was in the process of getting a workup for syncopal episodes by Dr. Gordon Harkness, and had been placed on a Holter monitor.  An EKG showed two premature ventricular contractions, one a fusion beat.[115]

On August 30, 2006, Anderson went to the ER with the chief complaint of seizure.  Dr. Mark Bair noted that Anderson had a syncopal episode at the top of the stairs in his home.  He fell down nine to ten stairs, hit the bottom, and went into a full grand mal seizure as described by his wife.  Anderson was given a full diagnostic workup.  A CT scan of the brain was normal.  Dr. Bair concurred with the decision of Anderson's primary care physician not to give prophylactic medication until an EEG was done.[116]

On January 11, 2007, Anderson underwent an EEG which was normal.[117]

### 3. Utah County Medical Associates

On June 24, 2004, Anderson saw Gordon Harkness, M.D.  He reported episodes of passing out that had been going on for some time, with dizziness before the episodes occurred. His girlfriend said that he would lose consciousness for about one minute, and when he would come back from it, he would not remember what happened, and would be confused.  The last such episode was the night before.  Dr. Harkness's assessment was (1) Syncopal episodes, (2)

---

[115]Tr. 202-03.

[116]Tr. 292-93, 296.

[117]Tr. 295, 314.

history of ADHD, and (3) hypertension.  Anderson was given an event monitor to use for the next forty-eight hours.[118]

Anderson was put on a Holter monitor again in September 2005.  The Holter Report by Diann Hiatt states:  "No significant tachycardia, ventricular ectopy or supraventricular ectopy. Pt. does have significant periods of bradycardia which did not correlate to any symptoms recorded on the patient's diary."[119]

### 4. Health Clinics of Utah

#### a. Gary Nelson, PA-C

On January 9, 2006, Anderson saw Mr. Nelson with complaints of passing out. Anderson reported that things would get kind of fuzzy, and at times, he would see stars or flashing lights, and then he would pass out.  He did not shake during these episodes.  It would take a while for him to regain consciousness.  Mr. Nelson's assessment was syncope, hypertension, GERD, and nonspecific chest pain with abdominal pain.[120]

On September 28, 2006, Anderson was seen in follow-up.  Mr. Nelson noted that Anderson had major depression, and also apparently had a seizure and fell down some stairs.[121]

---

[118]Tr. 224.

[119]Tr. 218.

[120]Tr. 283.

[121]Tr. 321.

On July 11, 2006, Anderson was seen by Mr. Nelson for followup on his depression.  Mr. Nelson noted that Anderson's antidepressant medication was working fairly well, and he was not really depressed, but he was still having anxiety attacks periodically.[122]

### b.  Rebecca Cate, FNP

On December 13, 2006, Anderson came in to have his medications refilled.  He had been experiencing bad headaches for a month and had been passing out, off and on, for about two weeks.  He stated that he gets a really bad headache, and then passes out.  His medication was helping to control his suicidal tendencies but he still had anger episodes.  He had severe anxiety although his medication took the edge off.  He was withdrawn and not speaking much.  Ms. Cate's assessment was (1) major depression, (2) unspecified seizure disorder, probable seizures at this time, (3) hypertension, and (4) anxiety.  She changed some of Anderson's medications, and referred him for an EEG.[123]

On January 8, 2007, Anderson came in for follow-up on his new meds.  He was very quiet.  He would not answer direct questions, and deferred to his wife on most questions.  His wife reported that he continued to have headaches with a few blacking-out episodes.  He continued to have severe depression with thoughts of just wanting to die and severe anger issues.  Ms. Cate increased some of his medications and referred him to Wasatch Mental Health.[124]

On May 8, 2007, Anderson came in for refills of his medications.  He had not made it to counseling at Wasatch Mental Health, but he was doing better with fewer anger outbursts and

---

[122]Tr. 269.

[123]Tr. 318-20.

[124]Tr. 315-17.

less suicidal ideation.  He had been given the EEG, and had been cautioned to stop the seizure medications.  He reported, however, that every time he stops the medication, he ends up having multiple episodes of passing out like every 5-10 minutes.  When asked how he was doing, Anderson stated that he was doing "good," which Ms. Cate noted was an improvement for him. She further noted that he had a slightly decreased affect, but was smiling and interacting more, and in general appeared to be healthier.  She gave him the numbers for adult outpatient treatment at Wasatch Mental Health.  In her assessment, Ms. Cate noted "Questionable seizure disorder."[125]

On October 3, 2007, Anderson came in for prescription refills and to have some lawyer forms filled out.  He still had not been to Wasatch Mental Health because he does not drive and his wife's work schedule would not allow her to take off work.  He appeared to be quite sedated on Seroquel.  He had not noticed an increase in aggression or headaches.  He had a calm, flat affect with dulled response time.[126]

On November 13, 2007, Anderson saw Ms. Cate for refill of his medications and to get a note for the Department of Workforce Services (DWS) stating that he could not work while appealing the denial of his social security benefits.  He was very slow to respond to questions, and had a blank stare.  His wife answered most questions.  He denied having any seizures in the last month.  Ms. Cate's assessment was (1) hypertension, (2) affective disorder/depression, and (3) "Question seizure regarding Conversion Disorder vs. true Seizure Disorder."  Ms. Cate again emphasized that Anderson should call Wasatch Mental Health as he needed a psychiatrist for

---

[125]Tr. 309-10.

[126]Tr. 306.

continuing treatment.  She wrote a note to DWS stating that Anderson "suffers from a severe affective disorder with seizures and fainting, he also has chronic headaches and hypertension at this time.  He cannot perform any type of meaningful employment.  Please re-evaluate in 6 months."[127]

### c. Joseph K. Miner, M.D., M.S.P.H.

On October 11, 2007, Dr. Miner, who was board-certified in occupational medicine, filled out a Work Capacity Evaluation (Mental) form.  Dr. Miner, found that Anderson had marked, or  extreme limitations in several categories.[128]  Dr. Miner noted that Anderson was very slow to respond to questions.  He would not, or was unable to, elaborate on his responses, but would simply repeat his response again.  Dr. Miner noted that he may well have a learning disability.  He was not on any medication, and Dr. Miner stated that "he may well need some to see if his mood and interaction is improved."[129]

---

[127]Tr. 300.

[128]Tr. 302-04.

[129]Tr. 305.

**5. Richard Kirkham, Ph.D.**

On April 2, 2003, Dr. Kirkham performed a psychological evaluation.  When asked what

his main job-related problem was, Anderson responded that it was lack of concentration, reading,

and self-confidence.[130]

Dr. Kirkham administered a battery of tests.  On the WAIS-III,  Anderson's verbal IQ

was 71, performance IQ was 84, and full scale IQ was 75.  His scores placed him in the below-

average, borderline, or slow-learner range of intelligence at the 5th percentile.  On the WRAT-R,

which measures the ability to read, spell, and perform mathematical calculations, Anderson

scored in the 3d percentile for reading which placed him at a 6th grade level; below the 1st

percentile in spelling which was below a third-grade level; and in the 1st percentile in arithmetic

which placed him at the fourth grade level.  His score for spelling was one standard deviation

lower than his full-scale IQ score which indicated a specific learning disability that included

spelling.[131]

Dr. Kirkham identified the following problems as shown by the evaluation:  (1)

Depression, (2) Attention Deficit Hyperactivity Disorder (ADHD), (3) below average level of

intellectual functioning, (4) dyslexia and specific learning disabilities, and (5) social anxiety.[132]

Dr. Kirkham recommended that he be referred to a psychiatrist for treatment with medication,

---

[130]Tr. 150.

[131]Tr. 152-533.

[132]Tr. 155-56.

and to psychotherapy to help him develop his self-confidence, and improve his problem-solving skills.[133]

### 6. Diane J. Peterson, M.S., L.M.F.T.

A letter from Ms. Peterson, dated April 25, 2005, states that Anderson had completed therapy for "his presenting problem of panic attacks and severe depression and anxiety." She noted that Anderson's functioning had improved, with depression and anxiety symptoms well-managed. He was coping a great deal better, and appeared better able to tolerate stress. However, he was still unemployed. Ms Peterson stated that his greatest obstacle appeared to be lack of self-confidence and a basic perception that he lacks competence. Ms. Peterson thought Anderson was in a good place to be able to learn and implement more effective life skills. She believed that with coaching to improve skills such as reading, writing, and resume building, he could find employment. She suggested additional therapy sessions.[134]

### 7. Jonathan J. Ririe, Ph.D.

Dr. Ririe performed a psychological evaluation on November 15, 2005 at the request of the agency.[135] Dr. Ririe noted that Anderson appeared to be suffering from significant depression, as well as panic attacks that interfered with his functioning. Anderson described suffering from ADHD, and had responded well to Adderall. However, he was not taking any medication because he had no insurance. Dr. Ririe did not do any formal intelligence testing, but

---

[133]Tr. 156-57.

[134]Tr. 187.

[135]Tr. 229-34.

noted that it would not be surprising to see his IQ in the borderline range.[136]  Dr. Ririe thought

treatment for depression, anxiety, and ADHD through psychopharmacological intervention was

necessary.  He also recommended counseling to help Anderson develop cognitive strategies to

deal with the issues and difficulties in his life.  Dr. Ririe thought with proper treatment, it would

seem reasonable that Anderson could return to a higher level of functioning.[137]

### 8. Psychiatric Review Technique

Gloria J. Tong, M.D., completed a Psychatric Review Technique Form finding that

Anderson suffers from (1) major depression, severe, without psychosis, (2) borderline

intellectual functioning, and (3) panic disorder with agoraphobia.[138]

## DISCUSSION

### A.  Legal Standard

Under the Social Security Act, "disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."[139]  The Act further provides that an

individual shall be determined to be disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

---

[136]Tr. 233.

[137]Tr. 234.

[138]Tr. 240-42.

[139]42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy."[140]

A person seeking Social Security benefits bears the burden of proving that because of his

disability, he is unable to perform his prior work activity.[141]  Once the claimant establishes that

he has such a disability, the burden shifts to the Commissioner to prove that the claimant retains

the ability to do other work and that jobs which he can perform exist in the national economy.[142]

The Commissioner's decision must be supported by substantial evidence.[143]  "Substantial

evidence" means "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."[144]  Evidence is not substantial if it is overwhelmed by other evidence or if

it constitutes mere conclusion.[145]

The Commissioner's findings of fact, if supported by substantial evidence, are conclusive

upon judicial review.[146]  In reviewing the Commissioner's decision, the court may not reweigh

the evidence or substitute its judgment for that of the agency.[147]  However, the court should

---

[140]42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[141]*Miller v. Chater*, 99 F.3d 972, 975 (10th Cir. 1996); *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

[142]*Saleem v. Chater*, 86 F.3d 176, 178 (10th Cir. 1996); *Miller*, 99 F.3d at 975.

[143]*Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997).

[144]*Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[145]*Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992); *Emory v. Sullivan*, 936 F.2d 1092, 1093 (10th Cir. 1991).

[146]42 U.S.C. §§ 405(g), 1383(c)(3); Perales, 402 U.S. at 390.

[147]*Hinkle*, 132 F.3d at 1351; *Decker v. Chater*, 86 F.3d 953, 954 (10th Cir. 1996).

carefully examine the record and review it in its entirety.[148]  Failure of the Commissioner to apply

the correct legal standard is grounds for reversal.[149]

The Commissioner has established the following five-step process for determining

whether a person is disabled:

(1)     A person who is working is not disabled.  20 C.F.R. § 416.920(b).

(2)     A person who does not have an impairment or combination of
impairments severe enough to limit his ability to do basic work
activities is not disabled.  20 C.F.R. § 416.920(c).

(3)     A person whose impairment meets or equals one of the
impairments listed in the "Listing of Impairments," 20 C.F.R. §
404, subpt. P, app. 1, is conclusively presumed to be disabled.  20
C.F.R. § 416.920(d).

(4)     A person who is able to perform work he has done in the past is
not disabled.  20 C.F.R. § 416.920(e).

(5)     A person whose impairment precludes performance of past work is
disabled unless the Secretary demonstrates that the person can
perform other work available in the national economy.  Factors to
be considered are age, education, past work experience, and
residual functional capacity.  20 C.F.R. § 416.920(f).[150]

## B.  The ALJ's Decision

The ALJ performed the sequential analysis, finding as follows:  (1) Anderson has not

engaged in substantial gainful activity since March 1, 2004, the amended alleged onset date; [151]

(2) he has severe impairments including "hypertensive vascular disease, syncopal episodes

---

[148]*Musgrave*, 966 F.2d at 1374; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

[149]*Daniels*, 154 F.3d at 1132; *Hinkle*, 132 F.3d at 1351.

[150]*Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

[151]Tr. 19.

(diagnosed variously as conversion disorder vs. true seizures, syncopal episodes (but there are no true objective medical findings to firmly diagnose this condition), reflux disease, depression, panic disorder with agoraphobia and borderline intellectual functioning";[152] (3) he does not have an impairment or combination of impairments that meets or equals the listings;[153] (4) he is unable to perform his past relevant work;[154] but (5) he is capable of performing jobs that exist in significant numbers in the national economy.[155]  Examples of jobs that the ALJ found Anderson could perform include warehouse worker, office helper, touch-up screener, and kitchen helper.[156] Based on these findings, the ALJ concluded that Anderson was not disabled as defined by the Social Security Act.[157]

Anderson raises three arguments in support of his disability claim:  (1) the ALJ erred at step five by failing to identify specific jobs that he could perform, consistent with his functional limitations; (2) the ALJ erred in improperly rejecting the opinions of Anderson's doctors and other medical professionals; and (3) the ALJ erred in improperly rejecting the testimony of Anderson and his wife.[158]

---

[152]Tr. 19.

[153]Tr. 20.

[154]Tr. 40.

[155]Tr. 41.

[156]Tr. 41.

[157]Tr. 42.

[158]Plaintiff's Opening Brief (Opening Brief) at 13-14, docket no. 21, filed October 12, 2009.

**C. Failure to Identify Specific Jobs that Anderson Could Perform in Light of His Limitations**

    **1.  Hypothetical to the VE**

Anderson contends that the ALJ failed to meet his burden at step five to identify specific jobs in the national economy that he is capable of performing given his limitations.  Specifically, Anderson states that the jobs identified by the VE were based upon an incomplete hypothetical. He argues that the ALJ's second hypothetical more accurately described his limitations.[159]  As discussed, the VE's response to the second hypothetical was that all jobs would be ruled out.[160]

The ALJ's hypothetical should contain all–and only–those limitations that are borne out by the evidentiary record.  The ALJ is not required to accept responses to a hypothetical that includes limitations not accepted by the ALJ as supported by the record.[161]  When the ALJ's hypothetical adequately reflects the ALJ's findings, the VE's testimony constitutes substantial evidence to support the ALJ's determination that the claimant is capable of performing other work that exists in the national economy.[162]  In the instant case, the ALJ's first hypothetical exactly reflected the limitations that the ALJ included in his RFC determination.[163]  Accordingly, the VE's answer identifying jobs that the hypothetical person could perform constituted

---

[159]Opening Brief at 16-20; Plaintiff's Reply Brief (Reply) at 1-6, docket no. 25, filed December 14, 2009.

[160]Tr. 405-06.

[161]*Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995); *Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000); *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996).

[162]*Decker*, 86 F.3d at 955.

[163]Compare hypothetical, tr. 402-03 to RFC determination, tr. 21.

substantial evidence to support the ALJ's conclusion that there were a significant number of jobs that Anderson could perform.

Anderson asserts that the first hypothetical was inaccurate because it failed to include limitations caused by his agoraphobia and panic attacks, and his syncopal episodes.  Anderson argues that because the ALJ found those conditions to be severe impairments, his failure to include them in the hypothetical was inconsistent with his own findings.[164]

The court notes, however, that the ALJ accounted for Anderson's agoraphobia and panic attacks in the first hypothetical by limiting it to jobs in which the hypothetical individual would not have to work with the general public, would work with only a few people in the work area, would have only minimal contact with others including co-workers and supervisors, and would work only at a low stress level.  Regarding the syncopal episodes, the ALJ's hypothetical provided that the hypothetical person could not work around dangerous, unprotected heights, machinery, or chemicals.[165]  Since the ALJ included in the hypothetical to the VE all of the limitations that the ALJ found credible, the VE's testimony constituted substantial evidence that the identified jobs could be performed by someone with Anderson's limitations.[166]

### 2. Consistency with the Dictionary of Occupational Titles

Anderson argues that the VE's testimony was inconsistent with the Dictionary of Occupational Titles (DOT), and that the ALJ failed to obtain a reasonable explanation for the

---

[164]Opening Brief at 17-20; Reply at 1-6.

[165]Tr. 402.

[166]*See Decker*, 86 F.3d at 955.

inconsistencies as required by Social Security Ruling 00-4p.[167]  The ALJ is required to ask the

VE if there is any conflict between his testimony and the DOT; and, if there is a conflict, to

obtain a reasonable explanation.[168]  In this case, the ALJ did ask the VE whether there was a

conflict, and the VE replied that there was not.[169]  Anderson argues, however, that the VE's

response to the first hypothetical does indeed conflict with the DOT.  Anderson asserts that while

the hypothetical provided that the person could do no reading, writing, math, or arithmetic on the

job, the DOT reflects that the jobs identified by the VE require significant amounts of each as

generally performed.

      The VE testified that the jobs he identified did require some minimal reading, writing, or

math which is consistent with DOT.  The VE therefore reduced the number of jobs to reflect the

inability to read, write, or do math, so as to include only those jobs that did not require such

abilities.[170]  Accordingly, the VE's testimony explained any inconsistency with the DOT.[171]

**D. Medical Opinions**

      "The ALJ is required to give controlling weight to the opinion of a treating physician as

long as the opinion is supported by medically acceptable clinical and laboratory diagnostic

---

[167]Opening Brief at 20-24; Reply at 6-7.

[168]*Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999).

[169]Tr. 407.

[170]Tr. 403-05.

[171]See *Haddock*, 196 F.3d at 1091-92 (stating that "a valid explanation would be that a specified number or percentage of a particular job is performed at a lower RFC level than the Dictionary shows the job generally to require.").

techniques, and is not inconsistent with other substantial evidence in the record."[172]  "An ALJ

may disregard a treating physician's opinion, however, if it is not so supported."[173]  In all cases,

the regulations require that the ALJ "give good reasons" in his decision for the weight that he

gave to the treating physician's opinion.[174]

Anderson asserts that the ALJ erred in improperly rejecting the opinions of Anderson's

doctors and other medical professionals.[175]  In particular, he states that Dr. Miner and his nurse

practitioner, Rebecca Cate, each opined that Anderson was disabled, and Dr. Miner specifically

noted a number of "marked" and "extreme" limitations when he filled out a mental work

capacity evaluation form on October 11, 2007.[176]

The ALJ stated that he gave "little weight" to the opinion of Dr. Miner for the following

reasons.  Dr. Miner saw Anderson only three times.  Dr. Miner completed the evaluation form

after the second visit on October 11, 2007, when he noted that Anderson was slow to respond.

The ALJ stated that Dr. Miner's assessment seemed to based on this one visit in which Dr. Miner

also noted that Anderson was not on medication.  The ALJ further noted that Dr. Miner's

assessment did not reflect his own previous examination on September 29, 2007 or

improvements noted on previous visits by other members of the Health Clinics of Utah staff

including Mr. Nelson and Ms. Cate.  Finally, the ALJ stated that Dr. Miner's assessment did not

---

[172]*Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).

[173]*Doyal*, 331 F.3d at 762 (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir.1994)).

[174]*Doyal*, 331 F.3d at 762; *Hamlin*, 365 F.3d at 1215.

[175]Opening Brief at 24-27; Reply at 9-11.

[176]Opening Brief at 24; Reply at 9.  See Work Capacity Evaluation (Mental), tr. 302-04.

correspond with Anderson's presentation at the hearing.  The ALJ concluded that Dr. Miner's assessment does not reflect the overall positive effects of Anderson's treatment, conflicts with other psychological opinions, and appears to be excessive.[177]

In opposition, Anderson asserts that the ALJ failed to acknowledge that Dr. Miner treated Anderson with the assistance of Nurse Practitioner Cate and Physician's Assistant Nelson. Anderson asserts that Dr. Miner had access to their treatment notes, and thus was fully competent to provide an overall picture of Anderson's limitations.[178]

First, the court notes that, contrary to Anderson's assertion, the ALJ did acknowledge that Ms. Cate and Mr. Nelson worked with Dr. Miner.  In explaining the weight he gave Dr. Miner's assessment, the ALJ stated that "Dr. Miner's assessment does not reflect improvements noted on previous visits at the Health Clinics of Utah with Mr. Nelson or Ms. Cate."[179]  The ALJ also acknowledged that Ms. Cate had noted Anderson's slowness to respond on other occasions.[180]

Further , the ALJ's conclusion that the assessment was based primarily on the one visit is supported by the Dr. Miner's handwritten notes added at the end of each section of the form in which he repeatedly refers to Anderson's slow responses to questions, and Dr. Miner's suspicion

---

[177]Tr. 39.

[178]Opening Brief at 25; Reply at 9-10.

[179]Tr. 39.

[180]Tr. 39.

that Anderson might have a learning disability.[181]  These notations closely correspond with Dr.

Miner's treatment notes of the same date:

> He is very slow to respond to questions if at all.  He will not or is unable to
> elaborate on responses but simply repeats response again.  He may well have a
> learning disability.  He is not on medication but may well need some to see if his
> mood and interaction is improved. [182]

Regarding Ms. Cate's, opinion, the ALJ noted that on October 13, 2007, she wrote a note

to DWS indicating that Anderson suffered from a severe affective disorder with seizures and

fainting, chronic headaches, and hypertension.  Ms. Cate stated that Anderson could not perform

any type of meaningful employment and should be reevaluated in six months.  The ALJ stated

that he gave little weight to Ms. Cate's opinion because it seemed to be based only on the

examination performed on the day of the report when Anderson was very slow to respond.  The

ALJ further noted that Ms. Cate's opinion did not reflect improvement in Anderson's condition

just six months earlier in May 2007, in spite of the fact that Anderson had not followed Ms.

Cate's recommendation to seek treatment at Wasatch Mental Health.  The ALJ concluded that

Ms. Cate's opinion addressed only a very short portion of the period under consideration.  In

addition, he noted that Ms. Cate's treatment notes provided very little detail regarding

Anderson's specific limitations.[183]

In this case, the record reflects that the ALJ carefully reviewed and discussed the

evidence, and gave "good reasons" for the weight that he gave the opinions of Dr. Miner and

---

[181]Tr. 302-03.

[182]Tr. 305.

[183]Tr. 39.  See also Ms. Cate's treatment notes, tr. 300-01.

Nurse Cate.[184]  The court therefore concludes that the ALJ's analysis of the medical evidence was proper.

Anderson also argues that the ALJ provided no reason for rejecting the opinions of Drs. Ririe and Kirkham, and the opinions of the state agency mental health doctors.[185]  However, the ALJ did not reject the opinions of these mental health professionals, none of whom opined that Anderson was disabled.  In his opinion, the ALJ stated that he had considered and weighed the opinions of the non-examining state agency medical consultants, but did not accept them in their entirety.[186]

In his Reply Brief, Anderson asserts that the ALJ failed to include in his RFC assessment certain findings of Dr. Gloria Tong, an agency physician who reviewed Anderson's medical records.[187]  Dr. Tong found that Anderson was "moderately limited" in several categories.[188]  The ALJ incorporated Dr. Tong's findings into his RFC assessment except for her finding that he had "moderate" limitations in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."[189]  Although Dr. Tong found that

---

[184]See *Doyal*, 331 F.3d at 762; *Hamlin*, 365 F.3d at 1215.

[185]Opening brief at 26-27; Reply at 10-11.

[186]Tr. 39-40.

[187]Tr. at 10-11.

[188]See Mental Residual Functional Capacity Assessment, tr. 251-54.

[189]*Id*. at 252.

Anderson's mental impairments result in a moderate degree of limitation,[190] she concluded that Anderson was capable of performing "simple activities in a low public contact setting" and that he would improve with treatment.[191]  This conclusion is not inconsistent with the ALJ's opinion. Similarly, Dr. Ririe concluded that with proper treatment, Anderson likely could return to a higher level of functioning.[192]

**E. Credibility Determination**

Anderson argues that the ALJ erred in improperly rejecting the testimony of Anderson and his wife.[193]  As the Tenth Circuit has observed, the evaluation of a claimant's subjective allegations of pain and other symptoms "ultimately and necessarily turns on credibility."[194] Generally, credibility determinations are the province of the ALJ and should not be disturbed if supported by substantial evidence.[195]  Nevertheless, the ALJ's findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."[196] In *Kepler v. Chater*, the Tenth Circuit held that the ALJ must give specific reasons for rejecting a claimant's subjective allegations of pain and other symptoms.[197]  However, so long as the ALJ

---

[190]Tr. 237-48.

[191]Tr. 249.

[192]Tr. 234.

[193]Opening Brief at 27-31; Reply at 11-12.

[194]*White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001).

[195]*McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002); *White*, 287 F.3d at 909.

[196]*McGoffin*, 288 F.3d at 1254 (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)).

[197]68 F.3d 387, 391 (10th Cir. 1995).

sets forth the specific evidence he relies on in assessing credibility, the requirements of *Kepler* are satisfied.[198]

In evaluating a claimant's subjective allegations of pain and other symptoms, the ALJ must determine (1) whether the claimant has established by objective medical evidence that he has a pain- or symptom-producing impairment; (2) whether there is a "loose nexus" between the impairment and the claimant's subjective allegations; and (3) if so, whether considering all of the evidence, both objective and subjective, the claimant's alleged symptoms are in fact disabling.[199]

In this case, the ALJ followed the proper analysis, finding that Anderson had medically determinable impairments that could reasonably be expected to produce the alleged symptoms. However, he found Anderson's statements concerning "the intensity, persistence and limiting effects of these symptoms (in particular the fainting) [were] not entirely credible."[200]

In making his credibility determination, the ALJ observed that a primary issue in this case obviously is whether Anderson "faints or passes out too much to be able to work in a safe manner at any job."[201]  In concluding that Anderson's fainting spells would not preclude all work, the ALJ noted that the medical records show that there is no real medically determinable, objective diagnosis to support Anderson's allegations regarding passing out.  Although Anderson went to the ER on August 30, 2006  complaining of a seizure, a CT brain scan was normal without evidence of intracranial pathology.  Dr. Bair, the ER doctor, declined to prescribe

---

[198]*White*, 287 F.3d at 909.

[199]*Hamlin v. Barnhart*, 365 F.3d 1208, 1220 (10th Cir. 2004).

[200]Tr. 38.

[201]Tr. 35.

medication unless Anderson had another seizure, since no one had prescribed medication before. On September 22, 2005, Diann Hiatt reported that a Holter monitor showed no significant tachycardia, ventricular ectopy or supraventricular ectopy.  Although the report showed significant periods of bradycardia, they did not correlate to any of the symptoms recorded in Anderson's diary.  Similarly, an EEG performed on January 11, 2007 was normal with no epileptiform activity.  The ALJ also noted that in her October 13, 2007 assessment, Ms. Cate questioned whether Anderson had a seizure disorder stating:  "Question seizure regarding Conversion Disorder vs. true Seizure Disorder."[202]

The ALJ also stated that the testimony of Anderson and his wife regarding his passing out was inconsistent and not persuasive.  For example, Anderson testified that he fainted the day before the hearing, but was unsure how long he was out.  His wife, however, stated that he last passed out a couple of days before the hearing.  The ALJ further noted that there are no diaries or journals recording these episodes and few specifics concerning them.  Other factors cited by the ALJ that called into question the fainting episodes were the fact that Anderson's wife allowed him to care for the children while she worked, and that Anderson drove a vehicle to pick up the children from school.  Further, Anderson testified that he passed out at least once a day while he was working, but this was observed only once by a fellow employee.  His wife testified that he was working successfully at the warehouse when she married him.  She only became aware of the problem when a friend told her that he had been found a few times passed out in his truck, and she was called to take him to the hospital.  In addition, his wife stated that he fainted at home

---

[202]Tr. 35; see Dr. Bair's ER report, tr. 292-94; EEG Report, tr. 295; CT Report, tr. 296; Holter Report, tr. 218; Nurse Practitioner Cate's treatment notes, tr. 300.

1-2 times a week.  Later, she said that he passed out every ten minutes when he was under stress, and if his medication was not working.  Then she said it usually happens 4 times a week.  The ALJ observed that in comparison Ms. Cate noted in May 2007, that Anderson had been cautioned to stop his seizure medication, but when he did he had multiple episodes of passing out, like every 5-10 minutes.  The ALJ concluded that given the lack of a true diagnosis for this condition, Anderson and his wife were not fully credible regarding the allegations of disabling fainting.[203]

In further support of his credibility determination, the ALJ noted that Anderson's wife testified that he talks of suicide at least once a week; and that he locks himself in the bedroom, uses a knife to cut his wrists, and passes out.  However, none of Anderson's examining physicians or assistants noted such cut marks or any injuries in this regard.[204]  Similarly, Anderson's wife testified that Anderson had seizures as a result of falling down.  However, the medial records reveal only one such incident when Anderson went to the ER in August 2006.  Even then, Dr. Bair declined to prescribe medication unless Anderson had another seizure, since no one had prescribed medication before.[205]

The ALJ also noted inconsistencies in the symptoms surrounding Anderson's fainting spells.  For example, early in the record, they seemed to be associated with dizzy spells.  Later on, Anderson reported that he passed out when he got really bad headaches.[206]

---

[203]Tr. 36-37; see Nurse Cate's treatment notes, tr. 309.

[204]Tr. 37.

[205]Tr. 37.

[206]Tr. 37.

The ALJ also stated that Anderson described his symptoms as being more severe than the record indicates. For example, Anderson testified that he did not receive treatment for his problems while he was working, and only got treatment after he lost his job. However, he also testified that he was having anxiety attacks and passing out every day on the job. Despite this, he had substantial gainful activity earnings from 1998-2002.[207]

The ALJ also observed many instances in the record when Anderson's symptoms improved with medication, despite his testimony that he was put on medications, but they never really helped.[208] Finally, the ALJ noted multiple instances of Anderson's failure to comply with prescribed treatment including his failure to contact Wasatch Mental Health despite repeated suggestions from his health care providers that he do so.[209]

Anderson takes issue with the ALJ's credibility determination. In particular, he criticizes the ALJ's reliance on his failure to comply with treatment recommended by his health care providers, and asserts that the ALJ failed to follow the Tenth Circuit's four-part non-compliance analysis.[210] However, as the Commissioner points out, this four-part standard first announced in *Frey v. Bowen*[211] applies to circumstances in which the ALJ denies a disability claim based on the claimant's refusal to follow prescribed treatment. In this case, the ALJ did not base his decision on Anderson's failure to comply with treatment. Rather, in evaluating the credibility of

---

[207]Tr. 35.

[208]Tr. 35-36.

[209]Tr. 37-38.

[210]Opening Brief at 28-30.

[211]816 F.2d 508, 517 (10th Cir. 1987).

Anderson's contention that his symptoms were disabling, the ALJ properly considered Anderson's efforts to relieve his symptoms including seeking and following recommended treatment.[212]

Anderson also disagrees with the ALJ's reasons for concluding that the testimony of Anderson and his wife concerning his syncopal episodes was inconsistent and not persuasive.[213] He asserts that many of the inconsistencies cited by the ALJ were not really inconsistencies at all, or that they were immaterial.  However, this argument is simply an invitation to reweigh the evidence which the court may not do.[214]

As discussed, the ALJ's credibility determination is entitled to great deference, and should not be disturbed where, as here, it is supported by substantial evidence.[215]  In this case, the the ALJ provided abundant, specific reasons for his credibility determination.

---

[212]Answer Brief at 26-27.  See *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)(rejecting a similar argument).

[213]Opening Brief at 30-31.

[214]*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

[215]*Kepler*, 68 F.3d at 391.

**ORDER**

The Commissioner applied the correct legal standard, and his decision is supported by

substantial evidence.  Accordingly, the decision of the Commissioner is **AFFIRMED**.


September 23, 2010.

BY THE COURT:

David Nuffer
U.S. Magistrate Judge